1

2

3

4

5

6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

7

8

9

10

11

12

13

14

PATRICIA LOUCKS, et al.,

                Plaintiffs,

       v.

KAISER FOUNDATION HOSPITALS, et al.,

               Defendants.

Case No.  20-cv-01216-EMC

**ORDER GRANTING UC REGENTS'
MOTION TO DISMISS, AND
GRANTING KAISER'S MOTION TO
COMPEL ARBITRATION**

Docket Nos. 14, 29

## I.      **INTRODUCTION**

This case arises out of the circumstances surrounding the death of Shawn Loucks ("Mr. Loucks"), who died at a UCSF hospital on February 23, 2019, after also receiving medical care at Kaiser Santa Rosa on February 10 and 20, 2019.  Plaintiffs are Patricia Loucks, Donna Barry, Luke Barry, Christina Keeney-Foster, Eric Foster, Pete Figone, Dawn Loucks, Ashley Loucks, Tony Marks, and Neno Meola-Marks (collectively "Plaintiffs").  Defendants are Kaiser Foundation Hospitals, Kaiser Foundation Health Plan, Inc, The Permanente Medical Group, Inc. (together "Kaiser"), American Medical Response ("AMR"), and the Regents of the University of California ("the Regents" or "the UC Regents") (all collectively "Defendants").  Plaintiffs assert claims for medical malpractice, dependent adult abuse, negligent infliction of emotional distress, intentional misconduct, violations of the Emergency Medical Treatment and Labor Act ("EMTALA"), and wrongful death.  *See* Docket No. 1 ("Complaint") ¶ 1.  Kaiser moves to compel arbitration of all of Plaintiffs' claims against Kaiser, or in the alternative, to dismiss the Complaint.  *See* Docket No. 4 ("Kaiser Mot.").  The UC Regents assert immunity under the Eleventh Amendment and therefore move to dismiss the suit for lack of personal jurisdiction; they

United States District Court
Northern District of California

1 │ alternatively seek dismissal for failure to state a claim, move for a more definite statement, and

2 │ move to strike certain portions of the complaint.  *See* Docket No. 14 ("UC Mot.").

3 │ ## II.   BACKGROUND

4 │ A.   Factual Background

5 │     Plaintiffs allege the following.  Prior to the events described herein, Mr. Loucks (age 51)

6 │ was "healthy and athletic."  Complaint ¶ 28.  On February 10, 2019, Mr. Loucks suddenly became

7 │ dizzy and nauseous.  *Id.*  He was taken by ambulance to the emergency room at Kaiser Santa Rosa

8 │ at around 2:45p.m.  *Id.* ¶¶ 2, 28.  Sometime after 10p.m., he was diagnosed with a stroke and sent

9 │ home; Plaintiffs contend that no tPA clot buster was administered.  *Id.*  Ten days later, Mr. Loucks

10 │ suffered another stroke and was again transported by ambulance to the emergency room at Kaiser

11 │ Santa Rosa.  *Id.* ¶ 3.  "After several hours," the medical staff determined that Mr. Loucks required

12 │ "a higher level of care."  *Id.*  Plaintiffs assert that "[a]ttempts were made to obtain a critical care

13 │ ambulance" to transfer Mr. Loucks to either UCSF or the Redwood City Kaiser, but "[t]here were

14 │ repeated delays in obtaining the ambulance."  *Id.*  Mr. Loucks was transferred to UCSF in the

15 │ early morning hours of February 21, 2019, where he died on February 23, 2019.  *Id.* ¶ 3, 6.

16 │     Plaintiffs allege that Kaiser "breached the standard of medical care and recklessly

17 │ discharged [Mr. Loucks] after the first visit," and they assert that "further hospitalization and close

18 │ monitoring . . . in all probability would have prevented his condition from deteriorating and

19 │ causing . . . the second and fatal stroke."  *Id.* ¶ 4.  They contend that "[t]he second Kaiser visit also

20 │ involved inappropriate delays in diagnosis and treatment, including but not limited to timely

21 │ critical care transfer."  *Id.* ¶ 5.  They also assert that Kaiser "had a pattern and practice of delaying

22 │ ambulance transfers" and "a pattern and practice of failing and refusing to transport critically ill

23 │ patients to the most readily available lifesaving critical care."  *Id.* ¶ 6.  Instead, the company

24 │ "avoided transfer to non-KAISER facilities and avoided using non-KAISER ambulances even

25 │ when it greatly increased the risk to their patients."  *Id.* ¶ 6.

26 │     At the same time, Plaintiffs also allege that "KAISER documents that they had consulted

27 │ with ambulance provider defendant AMERICAN MEDICAL RESPONSE (AMR) who had

28 │ promised to send their critical care ambulance but nonetheless and without telling anyone simply

United States District Court
Northern District of California

2

1    determined not to do so and refused to do so.  AMR negligently and recklessly and intentionally

2    refused to send the critical care ambulance as promised." *Id.* ¶ 8.  This caused Kaiser personnel to

3    "frantically search for an alternative critical care ambulance." *Id.*  Ultimately, the only critical

4    care ambulance that was located "had to come from hours away in Sacramento." *Id.*  Plaintiffs

5    allege that "[t]hese critical care delays were agonizing for the family members [who were present]

6    who recognized that these delays were causing severe harm" to Mr. Loucks; these delays furnish

7    the basis for the Plaintiffs' negligent infliction of emotion distress claims. *Id.*

8         Finally, Plaintiffs allege that "UCSF had been called repeatedly by KAISER to obtain

9    permission for immediate transport to UCSF but UCSF delayed for hours responding. This was

10   not only negligent and reckless but also violates the federal law EMTALA statute." *Id.* ¶ 9.

11   B.    Procedural Background

12        Plaintiffs filed their Complaint in federal court on February 19, 2020.  *See* Docket No. 1.

13   On April 21, 2020, the Regents filed a Motion to Dismiss (pursuant to both Rule 12(b)(2) and

14   Rule 12(b)(6)) and for a More Definite Statement, as well as a Motion to Strike.  *See* Docket No.

15   14.  On May 11, 2020, Kaiser filed a Motion to Compel Arbitration and Stay the Case and in the

16   Alternative to Dismiss.  *See* Docket No. 29.  These motions were heard on June 18, 2020.  *See*

17   Docket Nos. 29, 31.  On May 22, 2020, American Medical Response filed a Motion for a More

18   Definite Statement, to Dismiss, and to Strike.  *See* Docket No. 35.  That motion is scheduled to be

19   heard on July 23, 2020.  *See* Docket No. 44.

20              **III.    UC REGENTS' MOTION**

21   A.    Legal Standard

22        Under Federal Rule of Civil Procedure 12(b)(2), a court must dismiss an action where it

23   does not have personal jurisdiction over a defendant.  While the burden is on the plaintiff to

24   demonstrate that the court has jurisdiction, "the plaintiff need only make a prima facie showing of

25   jurisdictional facts to withstand the motion to dismiss." *Brayton Purcell LLP v. Recordon &*

26   *Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010) (citation omitted).  The Court must accept

27   uncontroverted allegations in the plaintiff's complaint as true and resolve all disputed facts in

28   favor of the plaintiff. *Id.*

United States District Court
Northern District of California

3

1

B.      Analysis

2          The UC Regents seek dismissal for lack of personal jurisdiction, contending that they are

3   immune from suit in federal court under the Eleventh Amendment.  *See* UC Mot. at 8, 10.  "The

4   ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by

5   private individuals in federal court."  *Beentjes v. Placer Cty. Air Pollution Control Dist.*, 397 F.3d

6   775, 777 (9th Cir. 2005) (quoting *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363

7   (2001)).  This rule "extends to suits by citizens against their own state and certain actions against

8   state agencies and state instrumentalities."  *Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176,

9   1180 (9th Cir. 2003) (internal citations and quotation marks omitted).

10          The Supreme Court and the Ninth Circuit have both previously found in numerous

11   contexts that the UC Regents are instrumentalities of the state entitled to Eleventh Amendment

12   immunity.  *See Regents of the Univ. of California v. Doe*, 519 U.S. 425, 431 (1997) [hereinafter

13   *Doe*] (finding the Eleventh Amendment applied to the Regents as instruments of the state); *BV*

14   *Eng'g v. Univ. of California, Los Angeles*, 858 F.2d 1394, 1395 (9th Cir. 1988) (internal

15   modifications and citations omitted) ("The University of California and the Board of Regents are

16   considered to be instrumentalities of the state and therefore enjoy the same immunity as the state

17   of California."); *see also Thompson v. City of Los Angeles*, 885 F.2d 1439, 1443 (9th Cir. 1989),

18   *overruled on other grounds by Bull v. City & Cty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010)

19   (citing *Hamilton v. Regents*, 293 U.S. 245, 257 (1934)) ("It has long been established that UC is

20   an instrumentality of the state for purposes of the Eleventh Amendment.").  Notably, these cases

21   do not involve action by the University of California in a unique governmental role different from

22   other public entities; instead, they involve its role *e.g.* as a prospective employer (*Doe*), alleged

23   copyright infringer (*BV*), and as law enforcement (*Thompson*).  Across various functions, the

24   courts have held the Regents enjoy Eleventh Amendment immunity.

25          In addition, in a case involving allegations of inadequate medical care furnished by faculty

26   of UCSF, Judge Wilken concluded that "[the] Regents are considered instrumentalities of the state

27   and therefore, absent waiver, enjoy Eleventh Amendment immunity.  *Herbert v. City & Cty. of*

28   *San Francisco*, No. C 08-5748 CW, 2009 WL 691067, at *1 (N.D. Cal. Mar. 10, 2009) (citing *BV*

United States District Court
Northern District of California

*Engineering*, 858 F.2d at 1395).  In *Herbert*, the plaintiff alleged that he sought care for knee pain at San Francisco General Hospital, where he was treated by physicians who were faculty members at UCSF.  *Id.*  He alleged that the doctors first diagnosed him with a "sprang knee," but that two days later, he returned to the hospital and was diagnosed with Methicillin-Resistant Staphylococcus Aureus and had seven surgeries to his left leg.  *Id.*  He named the UC Regents as defendants, and the Regents asserted Eleventh Amended immunity.  In concluding that immunity applied, Judge Wilken noted that the assertion was "supported by controlling case law" and that "[t]he Eleventh Amendment generally renders states immune from private damages claims brought in federal court."  *Id.* (citing *Stanley v. Trustees of California State University*, 433 F.3d 1129, 1133 (9th Cir. 2006) (Title IX lawsuit brought by a former student)).  Judge Wilken added that "[t]he bar is generally absolute and covers states as well as their 'instrumentalities.'"  *Id.* (citing *Doe*, 519 U.S. at 429).]

Even if the issue were to be revisited and examined anew under the Ninth Circuit's five-factor test for determining whether an entity should be considered an arm of the state, the Court finds Plaintiffs' arguments unavailing.  Plaintiffs' Opposition to UC Regents' Motion ("UC Opp.") at 2–4, 5, Docket No. 20.  Plaintiffs assert that the Ninth Circuit has "established a five-part test for use in evaluating a litigant's claim that it is an 'arm of the state' entitled to Eleventh Amendment immunity."  *ITSI T.V. Prods., Inc. v. Agric. Associations*, 3 F.3d 1289, 1292 (9th Cir. 1993); UC Opp. at 3.  The test is as follows:

> To determine whether a governmental agency is an arm of the state, the following factors must be examined: [1] whether a money judgment would be satisfied out of state funds, [2] whether the entity performs central governmental functions, [3] whether the entity may sue or be sued, [4] whether the entity has power to take property in its own name or only the name of the state, and [5] the corporate status of the entity. To determine these factors, the court looks to the way state law treats the entity.

*Id.* (quoting *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1423 (9th Cir. 1991)).  In addition, "the element of State liability is the single most important factor in determining whether an entity is an arm of the state."  *Doe v. Lawrence Livermore Nat. Lab.*, 131 F.3d 836, 839 (9th Cir. 1997) (on remand from the Supreme Court, which had clarified that the key inquiry was *legal* liability as

United States District Court
Northern District of California

opposed to *financial* liability such that indemnification by a non-state entity, such as an insurance company, did not eviscerate immunity).

With respect to the first factor, courts have previously found that money judgments against the Regents will be "satisfied out of state funds." *See, e.g.*, *Vaughn v. Regents of Univ. of California*, 504 F. Supp. 1349, 1353 (E.D. Cal. 1981) ("[A]ny judgment obtained by plaintiffs against the Regents will have to be paid out of the state treasury or other sources of state funds."); *see also Ass'n of Christian Sch. Int'l v. Stearns*, No. CV0506242SJORZX, 2006 WL 8434678, at *10 (C.D. Cal. Aug. 8, 2006) ("[T]he fact that Plaintiffs are not pursuing money damages does not alter the relationship between the state of California and the University.  If Plaintiffs were seeking money damages, it would be the state of California to which they would look.").  At the hearing, Counsel for the Regents also indicated that if there were to be a judgment against the Regents in this case, it would be paid by the state.  In addition, Courts have also found that the Regents perform a "central governmental function[]" of providing higher education to Californians.  *See, e.g.*, *Vaughn*, 504 F. Supp. at 1353 ("[T]he Regents perform[] the essential governmental function of providing the citizens of the State of California with a higher education.").  That function applies in the context of a public hospital of the University of California.  *See Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 127, 161 (W.D.N.Y. 1997), *disapproved on other grounds,* 428 F.3d 408 (2d Cir. 2005) (noting that a university hospital has the "primary purpose" of advancing higher education which "weighs in favor of granting the hospital sovereign immunity").  These facts both favor treatment of the Regents as an arm of the state.

On the other hand, the Court notes that the Regents may "sue or be sued," that the entity is a public corporation, and that it is "is intended to operate as independently of the state as possible."  *Vaughn*, 504 F. Supp. at 1353 (first citing *Jackson Sawmill Co. v. United States*, 580 F.2d 302, 308 (8th Cir. 1978), *cert. denied,* 439 U.S. 1070 (1979); and then quoting *San Francisco Labor Council v. Regents of the University of California*, 26 Cal.3d 785, 789 (1980)).  These factors would disfavor classifying the Regents as an arm of the state.

However, numerous cases have nonetheless concluded that—despite some factors tipping against immunity—the Regents are properly characterized as an arm of the state of California and

6

are therefore entitled to immunity.  *See, e.g.*, *Steshenko v. Albee*, 70 F. Supp. 3d 1002, 1009 (N.D.

Cal. 2014) (citing *Jackson v. Hayakawa*, 682 F.2d 1344, 1350 (9th Cir. 1982)) ("The Board of

Trustees is an arm of the state of California and thus the Board of Trustees may invoke the

Eleventh Amendment immunity."); *Herbert*, 2009 WL 691067, at *1 (finding immunity for the

Regents as discussed above); *Campbell v. Regents of Univ. of California*, No.

217CV2057KJMDBPS, 2018 WL 2970805, at *5 (E.D. Cal. June 11, 2018), *report and

recommendation adopted,* No. 217CV2057KJMDBPS, 2019 WL 325271 (E.D. Cal. Jan. 25, 2019)

("The Ninth Circuit has repeatedly held that the Regents are an arm of the State of California.").

*See also Vaughn*, 504 F. Supp. at 1353 (noting also that "members of the Board of Regents of the

University are appointed by the Governor and approved by the Senate, and thus the State retains a

measure of control over the governing body of the University of California"); *Jackson*, 682 F.2d at

1350 ("[T]he University of California and the Board of Regents are considered to be

instrumentalities of the state for purposes of the Eleventh Amendment."); *Mitchell v. Los Angeles

Cmty. Coll. Dist.*, 861 F.2d 198, 201 (9th Cir. 1988) ("California cases demonstrate that California

state colleges and universities are 'dependent instrumentalities of the state.'").

        To be sure, there is at least one context in which the University was found not to have

immunity.  *See Regents of Univ. of California v. Superior Court*, 17 Cal. 3d 533, 537 (Cal. 1976)

[hereinafter *Superior Court*] ("In choosing to invest its endowment by extending loans to

borrowers . . . , the University is acting in a capacity no different from a private university,

corporation, or individual investing in a similar manner" and it is "entitled to no sovereign

protection in its lending decisions.").  In *Superior Court*, the California Supreme Court examined

both the provision of the California Constitution establishing usury limits and also the provision

creating the University of California:

> Our conclusion is supported by an examination of the constitutional
> provision itself.  There the drafters established a generally
> applicable usury limit, exempting certain types of lenders, but
> providing for their regulation by the Legislature. (Cal. Const., art.
> XX, 2d § 22.)  The provision for regulation of even the exempt
> classes indicates an intent to regulate all loans for the protection of
> the public. There is no indication of any intent that the University
> should not fall within the general class of nonexempt money lenders.
> To the contrary, the University is intended to operate as

independently of the state as possible. (*See* Cal. Const., art. IX, § 9.)

17 Cal. 3d at 537.  Thus, in *Superior Court*, the usury limit specifically identified entities that would be exempt from the regulation, but did not include the Regents; accordingly, in their role as a lender, the Regents were not entitled to immunity from claims arising under the usury law. Here, Plaintiffs have not pointed to any analogous law that might subject the Regents to liability here.

Accordingly, even if some of the *ITSI* factors might suggest that the Regents are not properly characterized as an arm of the state—a number of relevant factors also tilt in favor of the conclusion that they are.  In addition, the Ninth Circuit has repeatedly concluded (as have district courts in cases post-dating *ITSI* and *Doe*) that the Regents are properly understood as an arm of the state and are therefore entitled to Eleventh Amendment immunity.

Plaintiffs argue that the Regents "have not established absolute immunity under the Eleventh Amendment as a matter of law."  UC Opp. at 2.  To the extent that Plaintiffs raise a waiver argument, *id.* at 2–4, 5, the Court finds that there is no meaningful development of that point in Plaintiffs' briefing.  Plaintiffs only vaguely "question[] if there might be a waiver of Eleventh Amendment Immunity depending upon a contractual agreement."  *Id.* at 5.  However, Plaintiffs offer nothing to substantiate this point, and the Court notes that numerous courts have concluded that EMTALA—to the extent Plaintiffs contend that statute is the basis of the waiver argument—contains no expression of intent to abrogate state immunity.  *See Campbell*, 2018 WL 2970805, at *5 (collecting cases); *see also Porter v. S. Nevada Adult Mental Health Servs.*, No. 16-CV-02949-APG-PAL, 2017 WL 6379525, at *14 (D. Nev. Dec. 13, 2017), *aff'd,* 788 F. App'x 525 (9th Cir. 2019) ("EMTALA, however, contains no clear expression of intent to abrogate the states' immunity.").  Ultimately, Plaintiffs have failed to make "a prima facie showing of jurisdictional facts" sufficient to "withstand the motion to dismiss."  *Brayton Purcell*, 606 F.3d at 1127.

Thus, the Court **GRANTS** the Regents' Motion to Dismiss for Lack of Personal Jurisdiction as to the Regents.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.    KAISER'S MOTION

Kaiser moves to compel arbitration and stay the case as to Kaiser, and in the alternative, to dismiss Plaintiffs' claims.

A.    Legal Standard

Under the Federal Arbitration Act ("FAA"), "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA establishes "a liberal federal policy favoring arbitration agreements." *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (citing 9 U.S.C. § 2); *see also Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 825 (9th Cir. 2019) (quoting 9 U.S.C. § 2).  Courts "must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted).

To determine "the validity of an arbitration agreement, federal courts apply state law contract principles." *Lau v. Mercedes-Benz USA, LLC*, No. CV 11-1940 MEJ, 2012 WL 370557, at *2 (N.D. Cal. Jan. 31, 2012) (citing *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002)).  However, arbitration agreements may "be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 563 U.S. at 339.

Typically, "the question whether an issue is arbitrable . . . is 'an issue for judicial determination . . . .'" *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (citing *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013)).  In other words, "there is a presumption that courts will decide which issues are arbitrable; the federal policy in favor of arbitration does not extend to deciding questions of arbitrability." *Oracle Am., Inc.*, 724 F.3d at 1072.  However, where "the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate" may be decided by an arbitrator. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).  "Such clear and unmistakable

9

1    evidence of agreement to arbitrate arbitrability might include . . . a course of conduct

2    demonstrating assent . . . or . . . an express agreement to do so." *Momot v. Mastro*, 652 F.3d 982,

3    988 (9th Cir. 2011).  Here, neither party asserts that the issues presented in Kaiser's Motion to

4    Compel Arbitration fall outside the jurisdiction of this Court; accordingly, the Court does not

5    address any issues of arbitrability.

6    B.    <u>Analysis</u>

7         Kaiser has moved for an order compelling Plaintiffs' claims to arbitration and staying this

8    case, or in the alternative dismissal of Plaintiffs' Complaint.  *See* Kaiser Mot. at 3.  Kaiser

9    contends:

10         The agreement under which Mr. Loucks was enrolled as a member
           of Kaiser Foundation Health Plan, Inc. ("Health Plan") contains an
11         arbitration provision requiring binding arbitration of all of Plaintiffs'
           claims against KAISER in this action.  The agreement requires
12         Plaintiffs to arbitrate any claim arising from or relating to "an
           alleged violation of any duty incident to or arising out of or relating
13         to this [Agreement]" or a member's relationship to Health Plan
           "irrespective of the legal theories upon which the claim is asserted."
14         The provision expressly applies to claims by heirs and relatives.

15    *Id.*

16         Several documents bear on whether Plaintiffs are bound to arbitrate their claims.  The full

17    text of the arbitration provision is included in the 2019 Traditional Plan HMO Plan Combined

18    Disclosure Form and Evidence of Coverage for San Francisco Health Service System Fund.  *See*

19    Exh. A ("EOC") to Declaration of Eric Carlile ("Carlile Decl."), Docket No. 29-4.  In relevant

20    part, that document provides:

21         **Scope of arbitration**
           Any dispute shall be submitted to binding arbitration if all of the
22         following requirements are met:

23         •    The claim arises from or is related to an alleged violation of
                any duty incident to or arising out of or relating to this EOC
24              or a Member Party's relationship to Kaiser Foundation
                Health Plan, Inc. ("Health Plan"), including any claim for
25              medical or hospital malpractice (a claim that medical
                services or items were unnecessary or unauthorized or were
26              improperly, negligently, or incompetently rendered), for
                premises liability, or relating to the coverage for, or delivery
27              of, services or items, irrespective of the legal theories upon
                which the claim is asserted

28

- The claim is asserted by one or more Member Parties against one or more Kaiser Permanente Parties or by one or more Kaiser Permanente Parties against one or more Member Parties
- Governing law does not prevent the use of binding arbitration to resolve the claim

Members enrolled under this EOC thus give up their right to a court or jury trial, and instead accept the use of binding arbitration except that the following types of claims are not subject to binding arbitration:

- Claims within the jurisdiction of the Small Claims Court
- Claims subject to a Medicare appeal procedure as applicable to Kaiser Permanente Senior Advantage Members
- Claims that cannot be subject to binding arbitration under governing law

As referred to in this "Binding Arbitration" section, "Member Parties" include:

- A Member
- A Member's heir, relative, or personal representative
- Any person claiming that a duty to him or her arises from a Member's relationship to one or more Kaiser Permanente Parties

"Kaiser Permanente Parties" include:

- Kaiser Foundation Health Plan, Inc.
- Kaiser Foundation Hospitals
- KP Cal, LLC
- The Permanente Medical Group, Inc.
- Southern California Permanente Medical Group
- The Permanente Federation, LLC
- The Permanente Company, LLC
- Any Southern California Permanente Medical Group or The Permanente Medical Group physician
- Any individual or organization whose contract with any of the organizations identified above requires arbitration of claims brought by one or more Member Parties
- Any employee or agent of any of the foregoing

"Claimant" refers to a Member Party or a Kaiser Permanente Party who asserts a claim as described above. "Respondent" refers to a Member Party or a Kaiser Permanente Party against whom a claim is asserted.

*Id.* (formatting and emphasis in original).

///

///

///

11

The arbitration provision is also discussed more briefly in the 2019 Group Agreement with San Francisco Health Service System.  *See* Exh. B ("Group Agreement") to Carlile Decl., Docket No. 29-4.

### Binding Arbitration

> As more fully set forth in the arbitration provision in the applicable Evidence of Coverage, disputes between Members, their heirs, relatives, or associated parties (on the one hand) and Health Plan, Kaiser Permanente health care providers, or other associated parties (on the other hand) for alleged violation of any duty arising out of or related to this Agreement, including any claim for medical or hospital malpractice (a claim that medical services or items were unnecessary or unauthorized or were improperly, negligently, or incompetently rendered), for premises liability, or relating to the coverage for, or delivery of, services or items pursuant to this Agreement, irrespective of legal theory, must be decided by binding arbitration and not by lawsuit or resort to court process, except as applicable law provides for judicial review of arbitration proceedings. Members enrolled under this Agreement thus give up their right to a court or jury trial, and instead accept the use of binding arbitration as specified in the applicable Evidence of Coverage except that the following types of claims are not subject to binding arbitration: Claims within the jurisdiction of the Small Claims Court; Claims subject to a Medicare appeals procedure as applicable to Kaiser Permanente Senior Advantage Members; Claims that cannot be subject to binding arbitration under governing law.

*See* Group Agreement.

Kaiser contends that Mr. Loucks would have been made aware of the arbitration provision in one or both of two ways.  First, the EOC "was made available to San Francisco Health Service System each year with instructions to distribute it to current and prospective subscribers in accordance with section 1363(a)(10), Cal. Health & Safe. Code."  Kaiser Mot. at 5.  During the period relevant to this lawsuit, "Mr. Loucks was enrolled as a health Plan member pursuant to his former employment under a group membership agreement between Health Plan and the San Francisco Health Service System."  *Id.*  Accordingly, he should have received the EOC (and the arbitration provision that it contained) through the distribution channels of the San Francisco Health Service System.

In addition, Kaiser asserts that in January 2018, "Mr. Loucks signed an enrollment form to enroll himself and his wife, Patricia, as Health Plan members in the San Francisco Health Service

System Plan." *Id.* at 5.  Right above the signature line on that form is a notice that provides:

> **KAISER FOUNDATION HEALTH PLAN, INC.,**
> **ARBITRATION AGREEMENT:**
>
> I understand that (except for Small Claims Court cases, claims subject to a Medicare appeals procedure or the ERISA claims procedure regulation, and any other claims subject to a Medicare appeals procedure or the ERISA claims procedure regulation, and any other claims that cannot be subject to binding arbitration under governing law) any dispute between myself, my heirs, relatives, or other associated parties on the one hand and Kaiser Foundation Health Plan, Inc. (KFHP), any contracted health care providers, administrators, or other associated parties on the other hand, for alleged violation of any duty arising out of or related to membership in KFHP, including any claim for medical or hospital malpractice (a claim that medical services were un-necessary or unauthorized or were improperly, negligently, or incompetently rendered), for premises liability, or relating to the coverage for, or delivery of, services or items, irrespective of legal theory, must be decided by binding arbitration under California law and not by lawsuit or resort to court process, except as applicable law provides for judicial review of arbitration proceedings. I agree to give up our right to a jury trial and accept the use of binding arbitration. I understand that the full arbitration provision is contained in the Evidence of Coverage.

*See* Exh. D ("Enrollment Form") to Declaration of Kern Carson ("Carson Decl."), Docket No. 29-3.

In response, Plaintiffs first contend that Kaiser's arbitration agreement does not comply with California Health and Safety Code Section 1363.1, which imposes specific requirements on health care service plans that require binding arbitration.  *See* Opposition to Kaiser's Motion at 3, Docket No. 36.  Section 1363.1 provides:

> Any health care service plan that includes terms that require binding arbitration to settle disputes and that restrict, or provide for a waiver of, the right to a jury trial shall include, in clear and understandable language, a disclosure that meets all of the following conditions:
>
> (a) The disclosure shall clearly state whether the plan uses binding arbitration to settle disputes, including specifically whether the plan uses binding arbitration to settle claims of medical malpractice.
>
> (b) The disclosure shall appear as a separate article in the agreement issued to the employer group or individual subscriber and shall be prominently displayed on the enrollment form signed by each subscriber or enrollee.
>
> (c) The disclosure shall clearly state whether the subscriber or

United States District Court
Northern District of California

enrollee is waiving his or her right to a jury trial for medical malpractice, other disputes relating to the delivery of service under the plan, or both, and shall be substantially expressed in the wording provided in subdivision (a) of Section 1295 of the Code of Civil Procedure.[1]

(d) In any contract or enrollment agreement for a health care service plan, the disclosure required by this section shall be displayed immediately before the signature line provided for the representative of the group contracting with a health care service plan and immediately before the signature line provided for the individual enrolling in the health care service plan.

Cal. Health & Safety Code § 1363.1.  If Plaintiffs' assertion of noncompliance is correct, the

binding arbitration provision would be unenforceable.  *See Malek v. Blue Cross of California*, 121

Cal. App. 4th 44, 50 (2004) ("A violation of section 1363.1 renders a contractually binding

arbitration provision in a health service plan enrollment form unenforceable.  Although we do not

foreclose the possibility that under the appropriate circumstances the doctrine of substantial

compliance might apply, we conclude that the Blue Cross enrollment form at issue here does not

substantially comply with section 1363.1.").

However, the notice provided to Mr. Loucks fulfills the requirements set forth in Section

1363.3: (a) it clearly states that the plan uses binding arbitration, including to settle claims of

medical malpractice ("I understand that . . . any dispute between myself, my heirs, relatives, or

other associated parties on the one hand and Kaiser Foundation Health Plan, Inc. (KFHP), . . . for

alleged violation of any duty arising out of or related to membership in KFHP, including any

claim for medical or hospital malpractice . . .  must be decided by binding arbitration under

California law and not by lawsuit or resort to court process . . . ."); (b) although the Group

Agreement is not explicitly organized into "articles," there is a section entitled "Binding

Arbitration," and the arbitration provision is also prominently displayed on the signed enrollment

---

[1] "Any contract for medical services which contains a provision for arbitration of any dispute as to professional negligence of a health care provider shall have such provision as the first article of the contract and shall be expressed in the following language: "*It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration.*"  Cal. Civ. Proc. Code § 1295(a) (emphasis added).

14

United States District Court
Northern District of California

1    form; (c) the wording of the disclosure is substantially similar to the wording provided in Section

2    1295(a) of the California Code of Civil Procedure; and (d) in the enrollment agreement, the

3    disclosure is displayed immediately before the signature line.  *See* Enrollment Agreement; EOC.

4         The cases cited by Plaintiffs do not compel a different conclusion (*i.e.* a finding that the

5    disclosure failed to comply with Section 1363.3).  For example, in *Malek*, Blue Cross "concede[d]

6    that the enrollment form d[id] not comply with subdivision (d) of section 1363.1 . . . because the

7    arbitration provision did not immediately appear before the signature line."  121 Cal. App. 4th at

8    61.  In addition, the Court found that the enrollment form did not meet the prominence

9    requirement of Section 1363.1(b) because "[t]he arbitration provision [wa]s in the same type size

10   and font as provisions authorizing deductions and release of medical information."  *Id.*  The court

11   further observed: "While the arbitration provision constitutes a separate numbered paragraph, it

12   does not stand out and was not readily noticeable from these other provisions."  *Id.*  Here, by

13   contrast, the arbitration provision appears directly above the signature line of the enrollment form,

14   and it appears in bold with a title printed in capital lettering and enlarged font size.  It is fair to say

15   that it is "readily noticeable."  *Id.*; *see also Imbler v. PacifiCare of Cal., Inc.*, 103 Cal. App. 4th

16   567, 579 (2002) (finding a failure to comply with the prominence requirement where "the

17   disclosure sentence was written in the middle of the authorization for the release of medical

18   records and an authorization for payroll deduction of premiums" and where it "was in the same

19   font as the rest of the paragraph, and was not bolded, underlined or italicized"); *Burks v. Kaiser

20   Found. Health Plan, Inc.*, 160 Cal. App. 4th 1021, 1025 (2008) (finding a failure to comply with

21   the prominence requirement where the arbitration provision was "printed in typeface that is

22   substantially the same or smaller than the typeface used on the rest of the enrollment form" and

23   was "not highlighted, italicized, or bolded" and "lack[ed] any kind of heading").  Accordingly, the

24   Court finds that the disclosure of the arbitration provision complies with Section 1363.3.

25        Next, Plaintiffs contend that the Enrollment Form is not a "binding contract."  *See* Opp. at

26   4.  They note that it "is not signed by anyone on behalf of Kaiser," and therefore that "[t]here is no

27   acceptance."  *Id.* (internal quotation marks omitted).  Plaintiffs also note that the Enrollment Form

28   produced by Kaiser "is only for the January - December 2018 plan year. The event in question

1    happened in February of <u>2019</u> the following year.  No signed form has been provided for the year

2    2019 in question."  *Id.* (emphasis in original).  Their contention is that because there is no form for

3    2019 and/or because there is no proof of "offer and acceptance," no arbitration agreement exists

4    between the parties.  *Id.*; *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299

5    (2010) ("[C]ourts should order arbitration of a dispute only where the court is satisfied that . . . the

6    formation of the parties' arbitration agreement . . . [is not] in issue.").

7         However, Kaiser contends that there is no requirement "that an enrollee sign a new

8    enrollment form each year. . . . [and t]here is no dispute that Mr. Loucks's enrollment continued in

9    2019."  Kaiser's Reply in Support of Motion to Compel Arbitration or Dismiss ("Kaiser Reply")

10   at 3, Docket No. 37.  The existence of a contract between Kaiser and Mr. Loucks is evidenced by

11   their mutual performance.  *See* Cal. Civ. Code § 1584 ("Performance of the conditions of a

12   proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the

13   proposal.").  California courts have specifically recognized that performance can evince offer and

14   acceptance in the context of insurance contracts with arbitration provisions.  *See, e.g.*, *NORCAL*

15   *Mut. Ins. Co. v. Newton*, 84 Cal. App. 4th 64, 78–82 (Cal. 2000) (where respondent's action

16   "constituted conduct seeking the benefit, and therefore requiring acceptance of the burden, of the

17   insurance policy" she could not avoid arbitration as required by the policy); *Avina v. Cigna*

18   *Healthplans of California*, 211 Cal. App. 3d 1, 3 (Cal. Ct. App. 1989) ("To allow respondent to

19   assert rights and benefits under the contract and then later repudiate it merely to avoid arbitration

20   would be entirely inequitable. Consequently, . . . respondent is estopped by her own subsequent

21   conduct from denying the existence of a contractual obligation.").  Here, too, Mr. Loucks enjoyed

22   the benefits of health insurance coverage through Kaiser, and Kaiser provided that coverage to

23   him prior to his death; thus, the parties' conduct also evinces the existence of a contractual

24   agreement between Mr. Loucks and Kaiser.

25        In addition, Kaiser contends that "Plaintiffs' assertion that the enrollment form does not

26   constitute a binding agreement is contrary to the law" because "well-established California law"

27   indicates that employers "have the authority to enter into agreement[s] for group health care

28   coverage for their employees and dependents."  Kaiser Reply at 2 (citing *Madden v. Kaiser Found.*

United States District Court
Northern District of California

16

*Hosps.*, 17 Cal. 3d 699, 705–09 (1976)).  In *Madden*, the California Supreme Court held that "an agent or other fiduciary who contracts for medical treatment on behalf of his beneficiary retains the authority to enter into an agreement providing for arbitration of claims for medical malpractice."  17 Cal. 3d at 709.  Although *Madden* involved a federal statute that conferred authorization for an agency relationship, subsequent cases have interpreted it to stand for the more general principle that an employer has authority to enter into an agreement for healthcare on behalf of employees.  *See, e.g.*, *Viola v. Dep't of Managed Health Care*, 133 Cal. App. 4th 299, 311 (2005), *as modified on denial of reh'g* (Nov. 4, 2005), *as modified* (Nov. 9, 2005) ("In *Madden*, the Supreme Court concluded that an employer, acting as agent of its employees, has implied authority to agree to binding arbitration of malpractice claims arising under a health services plan it negotiates as part of an employee benefit package."); *Buckner v. Tamarin*, 98 Cal. App. 4th 140, 142 (2002) (citing *Madden*, 17 Cal. 3d at 706.  In keeping with that approach, here, Kaiser's signature appears on an agreement between Mr. Loucks's *employer* and Kaiser, as opposed to on the Enrollment Form signed by Mr. Loucks.  *See* Exh. E ("Renewal Group Agreement Letter") to Carson Decl., Docket No. 29-3 (with signatures of representatives of both Kaiser and the San Francisco Health Service System indicating renewal of the parties' contract for the 2019 year).  Thus, even setting aside Mr. Loucks's direct commitment to the arbitration provision, the agreement between Kaiser and San Francisco Health Service System—which also contains the arbitration clause—binds Mr. Loucks as well.

Lastly, Plaintiffs argue that the Court should use its "broad discretion" to deny Kaiser's Motion to Compel Arbitration because the "caselaw supports denial of arbitration pursuant to [California Code of Civil Procedure] 1281.2(c) . . . where there are non-signatories to the arbitration agreement and there is a risk of conflicting outcomes."  Opp. at 5.  In relevant part, Section 1281.2(c) states:

> On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists, unless it determines that . . . [a] party to the arbitration agreement is also a party to a pending court action or

> special proceeding with a third party, arising out of the same transaction or series of related transactions and there is a possibility of conflicting rulings on a common issue of law or fact.  For purposes of this section, a pending court action or special proceeding includes an action or proceeding initiated by the party refusing to arbitrate after the petition to compel arbitration has been filed, but on or before the date of the hearing on the petition. **This subdivision shall not be applicable to an agreement to arbitrate disputes as to the professional negligence of a health care provider made pursuant to Section 1295.**

Cal. Civ. P. Code § 1281.2 (emphasis added).  Assuming Section 1281.1 is not preempted by the FAA, the last sentence of Section 1281.2(c) would deprive the Court of discretion it might otherwise have to deny arbitration under Section 1281.2(c).  The caselaw suggests that Plaintiffs' claims fall within the realm of professional negligence and that Mr. Loucks's heirs can be bound to arbitrate even their independent actions.  *See, e.g.*, *Ruiz v. Podolsky*, 50 Cal. 4th 838, 851 (Cal. 2010) ("Although a wrongful death claim is an independent action, wrongful death plaintiffs may be bound by agreements entered into by decedent that limit the scope of the wrongful death action."); *Mormile v. Sinclair*, 21 Cal. App. 4th 1508, 1511 (1994) (concluding that "a patient can bind his or her nonsignatory spouse to arbitrate a loss of consortium claim against a health care provider"); *Bolanos v. Khalatian*, 231 Cal. App. 3d 1586, 1591 (Ct. App. 1991) (internal citations and quotation marks omitted) (compelling third-party emotional distress claim to arbitration and noting that "where, as here, a patient expressly contracts to submit to arbitration any dispute as to medical malpractice, and that agreement fully complies with Code of Civil Procedure section 1295, it must be deemed to apply to *all* medical malpractice claims arising out of the services contracted for, regardless of whether they are asserted by the patient or a third party").

Accordingly, the Court **GRANTS** Kaiser's Motion to Compel Arbitration and **STAYS** the case as it relates to Plaintiffs' claims against Kaiser.

///

///

///

///

///

///

1

**V.      CONCLUSION**

For the foregoing reasons, the Court **GRANTS** the UC Regents' Motion to Dismiss for

lack of personal jurisdiction.  It also **GRANTS** Kaiser's Motion to Compel Arbitration and

**STAYS** the case as to Plaintiffs' claims against Kaiser.  Accordingly, Kaiser's Motion to Dismiss

is **DENIED** as moot.

This order disposes of Docket Nos. 14 and 29.


**IT IS SO ORDERED**.


Dated: June 25, 2020


_____
EDWARD M. CHEN
United States District Judge